JODANNA L. HASKINS (Colo. Bar No. 41285)
Email: HaskinsJo@sec.gov
ZACHARY D. WILLIAMS (Colo. Bar No. 56979)
Email: WilliamsZach@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, Colorado 80294
Telephone: (303) 844-1000
Facsimile: (303) 297-3529

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Case No. 25-cv-00076 |
| Plaintiff, | **COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| JOECOOL.COM, LLC, JOSEPH ARIEL HABER, and ROBERT TYE COURNOYER, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Joecool.com, LLC ("Joecool"), its Chief Executive Officer ("CEO") Joseph Ariel Haber ("Haber"), and Robert Tye Cournoyer ("Cournoyer") alleges as follows:

## SUMMARY OF ALLEGATIONS

1. Joecool raised over $2 million from at least 18 investors on the back of a lie by its CEO, Haber: that Haber would use investor money to produce, package, market, and sell cannabidiol ("CBD") infused coffee products through Joecool, an entity Haber controlled. Instead, Haber used almost half of the investors' money—approximately $731,000—to fund his gambling and high-roller habits, including by making various purchases at casinos, pawn shops,

restaurants, and cigar lounges. Haber also made approximately $151,000 of net cash withdrawals, at least a portion of which he misused. As for the rest of the investors' money, Haber gave almost all of it—over $980,000—to Cournoyer for finding Joecool investors, persuading them to invest, and negotiating the terms of the investments. Joecool investors never received any profit distributions or recouped their investment.

2. To further entice investors to invest, Haber and Cournoyer told investors that Joecool was negotiating or had secured lucrative sales contracts with several well-known wholesaler businesses. But those businesses did not negotiate with, much less enter into contracts with, Joecool. In fact, none of the well-known wholesalers with which Joecool was purportedly doing business had ever heard of Joecool, Haber, or Cournoyer.

3. The lies continued after Haber told investors that Joecool was transitioning to a multi-level marketing ("MLM") company. Haber told investors that his wife—who held the title of President and managing member of Joecool but was never substantively involved in the business—had 40 years of multi-level marketing ("MLM") experience. This was not true: Haber's wife—who was 49 years old when Haber claimed she had 40 years of MLM experience—never founded, managed, or even worked for an MLM company.

4. As a result of the conduct described herein, Defendants violated and, unless restrained and enjoined, will continue to violate Sections 5(a), 5(c), and 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5]. In addition, Haber and Joecool violated and, unless restrained and enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder. Cournoyer also violated and, unless restrained and enjoined, will continue to violate Section 15(a) of the Exchange Act.

5. The SEC seeks, against all Defendants, (i) permanent injunctions; (ii) disgorgement on a joint and several basis of all ill-gotten gains from the unlawful activity set forth in this Complaint under Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C.§

2

78(d)(3), (5), and (7)] together with prejudgment interest; (iii) civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and, with respect to Haber and Cournoyer, (iv) bars prohibiting them from serving as an officer or director of a public company; and (v) an injunction prohibiting them from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however, that such injunction would not prevent them from purchasing or selling securities for their own personal account.

## DEFENDANTS

6. **Joecool.com, LLC** is a Nevada limited liability company ("LLC") that was founded in September 2019. Between November 2019 and February 2024 (the "Relevant Period"), Joecool purported to offer various CBD-infused coffee products, including K-cups, coffee beans, and energy shots.

7. **Joseph Ariel Haber**, age 54, is a resident of Henderson, Nevada and is the CEO and controlling managing member of Joecool. Haber controlled Joecool's bank accounts during the Relevant Period.

8. **Robert Tye Cournoyer**, age 57, has previously resided in Texas, but his current state of residence is unknown. During the Relevant Period, Cournoyer was Joecool's Vice President of Investor Relations. He raised approximately $2 million for Joecool by soliciting investors, including many investors who had previously invested in other entities controlled by Cournoyer, Green Equity Group, LLC ("GEG") and RS Group, LLC ("RS Group"). The SEC has sued Cournoyer twice before, most recently in the pending matter, *SEC v. Cournoyer, et al.*, Case No. 24-cv-01304 (D. Colo., filed May 10, 2024). In 2004, Cournoyer was enjoined from violating certain provisions of the federal securities laws and from participating in any offering of penny stock, *SEC v. GetAnswers, Inc., et al.*, No. 03-cv-20048 (S.D. Fla., filed Jan. 2003), and the SEC barred Cournoyer from association with any broker or dealer, *In re Cournoyer*, Exchange Act Release No. 34- 49720 (May 18, 2004)

(Order).

**JURISDICTION AND VENUE**

9.  The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

10. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and 28 U.S.C. § 1391(b). Joecool is a Nevada LLC that conducted business in this district, including soliciting, offering, and selling Joecool securities to at least one investor who resides in this district. Haber also solicited investors from Henderson, Nevada, where he resides.

**FACTS**

**I.   Background**

11. Haber and his wife formed Joecool in September 2019. From that time and through the Relevant Period, Joecool claimed to be selling CBD-infused coffee products, including K-cups, coffee beans, and energy shots.

12. During the Relevant Period, Haber was the only person who exercised control over the bank accounts into which Joecool investors funds were deposited. He also was the controlling managing member of Joecool and exercised control over the entity. All of Joecool's business decisions were made by Haber and not by investors, who relied solely on Joecool's efforts and expertise to generate profits.

13. From its inception through February 2022, Haber and Cournoyer claimed Joecool sold its products to grocery stores, hotels, casinos, and airlines. Starting in February 2022, Haber told investors that Joecool had pivoted to an MLM business model. Haber described Joecool's MLM business model as "Consumer-to-Consumer Sales" by "a team of over 250,000 Brand Loyal and Enthusiastic affiliate ambassadors" that Haber claimed Joecool was "building."

**II.  The Offer and Sale of Joecool Securities**

14. Haber began raising funds from investors in November 2019. By at least May

2020, Cournoyer had joined in the effort. Between November 2019 and February 2024, Haber and Cournoyer raised over $2 million from at least 18 investors across the country by offering and selling Joecool securities in the form of LLC units.

15. Haber and Cournoyer solicited investors via emails, phone calls, and a YouTube video posted on May 27, 2020.

16. In the May 27 YouTube video, Haber stated that Joecool's business model was to "sell to businesses . . . in large volumes . . . . [W]e're making some progress in getting into hotels, airlines, supermarkets, and whatnot. These [are] our major distribution outlets. . . . [Joecool] has an upward potential of making money in the billions, with a b. . . . This opportunity will not last." During the video, Cournoyer said that his role at Joecool was "rais[ing] money," and that Joecool "plan[ed] to do profit sharing, as soon as [it] start[ed] making money, within probably the first 6 to 12 months." He claimed he was involved in private equity and had "raised several hundred million dollars over the last 20–25 years," and that Joecool "will have the highest return out of anything [he had] ever done." He further stated that Joecool was "at the beginning stages" but was about to embark into "a funding process." Per Cournoyer, Joecool was in "the right time with the right product" and investors were "getting the highest equity, the best opportunity, [and] the best risk versus reward." According to Cournoyer, Joecool was "not just a thought" but was "actually moving."

17. Cournoyer also personally identified at least 16 Joecool investors, many of whom previously invested in Cournoyer's entities (GEG and RS Group), solicited their investment via phone calls and emails, persuaded them to invest, and negotiated the terms of the investments.

18. Once the terms of the investment were settled, Cournoyer or Haber would send investors executed unit purchase agreements, which Haber and the investors signed, along with instructions on how to wire their investment to one of Joecool's bank accounts.

19. In exchange for their investment, Haber, who was designated as Joecool's controlling managing member in Joecool's operating agreement, sent investors "LLC Membership Certificate[s]" reflecting their ownership shares in Joecool.

20.     None of the documents provided to investors, including Joecool's operating agreement and its unit purchase agreements, disclosed that Haber or Cournoyer would receive salaries, commissions, or any type of payment related to Joecool's business or the offer or sale of Joecool securities.

21.     Joecool did not return any money to investors.

### III.     Joecool and Haber Misappropriated and Misused Investor Money.

22.     Rather than using investor funds to produce, package, market, and sell Joecool products as promised, Haber, through Joecool, misappropriated investor funds for his own personal use, and misused other investor funds by paying Cournoyer undisclosed commissions for finding Joecool investors, persuading them to invest, and negotiating the terms of the investments.

23.     Specifically, Haber misappropriated at least $731,000 of the over $2 million Joecool received from investors by using hundreds of thousands of dollars on Google Play gambling applications and at brick and mortar casinos, as well as spending hundreds of thousands of dollars on personal expenses including alcohol, travel, luxury retail purchases, and purchases at pawn shops, restaurants, cigar lounges, and grocery stores. Haber also made approximately $151,000 of net cash withdrawals, at least a portion of which he misused.

24.     In many instances, Haber's illicit purchases happened in close proximity to (and often on the same day as) investor deposits. Investor funds were often deposited into Joecool bank accounts with a low balance and then spent in the same month, and in some cases, within days, on the personal expenses identified above.

25.     For example, on October 28, 2020, an investor's $15,000 investment was deposited into a Joecool bank account with a balance of $1,036. On the same day, Haber transferred $3,500 to his personal account and wired Cournoyer $10,000. The next day, Haber withdrew $500 from a Las Vegas casino ATM and spent $233 at a cigar lounge. And the following day, Haber spent $1,000 playing slot machines. During this three-day period, Haber also spent approximately $150 on "Bundle Packages" in a Google Play slot machine application.

26. Haber, through Joecool, also misused investor funds by making undisclosed payments to Cournoyer totaling approximately $981,700—roughly half of the investor funds—in connection with Cournoyer's efforts to raise money for Joecool. Combined with Haber's misappropriation, Haber depleted at least $1.7 million of the approximately $2 million in investor funds. This figure does not account for Haber's $151,000 of net cash withdrawals, at least some of which was misused by Haber.

27. Most of Haber's payments to Cournoyer followed the same pattern: on or about the same day investor funds were deposited into Joecool's bank accounts, Haber wired Cournoyer or his entities roughly half of the investor's funds.

28. For example, on November 30, 2020, an investor wired $25,000 to one of Joecool's bank accounts in exchange for Joecool securities. On the very same day, Haber wired $12,500—exactly half of the investor's funds—from that same account to a bank account belonging to an entity Cournoyer controlled.

29. The same thing happened a few weeks later. On December 17, 2020, the same investor wired $25,000 to the same Joecool bank account in exchange for Joecool securities. That same day, Haber wired $12,500—again, exactly half of the investor's funds—from that same account to a bank account belonging to an entity Cournoyer controlled.

30. Haber knew or was reckless in not knowing, and should have known, that he was deceiving investors by misappropriating and misusing their funds after representing that he would use their funds to produce, package, market, and sell Joecool products. Given that he was the controlling manager member of Joecool as outlined in Joecool's operating agreement, signed the unit purchase agreements, and authored the statements regarding how Joecool would use investor funds, Haber knew his representations to investors about the use of their funds were false. Haber's intent is also evidenced by, among other things, him spending investor funds on personal expenses soon after their deposit and his pattern of sending Cournoyer approximately half of the investor funds shortly after the investment was made.

31. Haber's scienter is imputed to Joecool because he controlled the entity and

was its controlling managing member.

IV. **Defendants Made False and Misleading Statements to Investors.**

    A. **Haber and Joecool Made False and Misleading Statements About the Use of Investor Funds.**

32. During the Relevant Period, Haber, individually and through Joecool, told investors that their funds would be spent on producing, packaging, marketing, and selling Joecool's products. These statements were false and misleading because, as alleged above, Haber instead misappropriated at least a little less than half of investors' funds and gave approximately half of investors' funds to Cournoyer.

33. Specifically, Joecool's October 1, 2019 Investor Prospectus, which Haber wrote, told investors that "[i]nvestor capital will be used for manufacturing, packaging, and to aide our marketing strategy—to leverage our trade conferences and vendor/distributor strategy." Haber sent this document to investors to solicit their investment.

34. Similarly, Joecool's July 20, 2020 Investor Projections, which Haber wrote, told investors that Joecool "require[ed] additional internal funding for the next round of manufacturing." Haber sent this document to investors to solicit their investment.

35. These documents were attributed to Joecool. Haber had ultimate authority over the statements as he controlled Joecool, was its controlling managing member, and wrote the statements.

36. Haber repeated the same misrepresentations via email to at least one investor who asked Haber how his funds would be used. Specifically, on April 12, 2021, Haber, on behalf of Joecool and using his Joecool email address, offered an investor "an agreement for $13k for 0.65%" of a Joecool LLC unit. The investor responded that he was "on board with the last piece of investment capital" but he was "a bit concerned about [Joecool's] monthly need for cash flow . . . . What is this new money [going] to be used on?" Haber responded that the "new money is going to manufacture more kcups [sic]."

37. On April 16, the investor wired "$13k" for "0.65% investment in Joe Cool

[sic]" to one of Joecool's bank accounts.

38. Haber did not use this investor's funds on K-cups and almost none of it was spent on items related to Joecool's business. Instead, between April 16 and 22, Haber (i) wired $7,000 of this investor's money to Cournoyer; (ii) withdrew almost $3,000 from a casino ATM; (iii) transferred $500 to his personal account; and (iv) spent almost $700 on personal expenses, such as groceries and at restaurants.

39. In all these materials, Haber's statements about the use of investor funds were false and misleading. Instead of using investor funds as described, Haber and Joecool misappropriated and misused a significant portion of investor funds for Haber's personal expenses and payments to Cournoyer.

40. Haber knew or was reckless in not knowing, and should have known, that his statements concerning the intended use of investor funds were false and misleading at the time they were made to investors and potential investors because he was Joecool's sole controlling managing member and, as a signatory on Joecool's bank accounts, had knowledge about the use of investor funds.

41. Haber's scienter is imputed to Joecool because he controlled the entity and was its controlling managing member.

42. The statements about the use of investor funds were material to investors because reasonable investors would consider it important that Haber and Joecool did not use their funds on producing, packaging, marketing, and selling Joecool products but, instead, used a significant portion of their funds for Haber's personal expenses and payments to Cournoyer.

**B.   Defendants Made False and Misleading Statements About Joecool Negotiating and Securing Lucrative Sales Contracts with Wholesaler Businesses.**

43. Haber, individually and through Joecool, and Cournoyer told investors they were negotiating with or had secured lucrative sales contracts between Joecool and various grocery stores, hotels, casinos, and airlines.

9

44. Joecool's July 20, 2020 Investor Projections, which Haber wrote, told investors that Joecool was "in discussions and [was] being vetted as the exclusive CBD coffee brand for [an] Airline[]. This vanity account will bring us vast goodwill as a 'trusted' brand." This document was attributed to Joecool. Haber had ultimate authority over the statements as he controlled Joecool, was its controlling managing member, and wrote the statements.

45. Cournoyer told investors in a November 17, 2020 email that he "was with Mr. Haber and we had meetings with [a casino resort] and we were able to establish a test run on 300–500 rooms in one of the Vegas properties to offer JoeCool [sic] coffee products."

46. Regarding the same casino resort, in a January 18, 2021 email, Cournoyer told investors that he had a "meeting with [the casino resort] to provide them with CBD infused coffee in the form [of] K cups [sic]. . . . [T]his program is moving forward with a start date during the March Madness Collegiate basketball series."

47. Regarding the same casino resort, in an October 6, 2023 email, Haber told one investor that the casino was "open to offering our Joecool Brands Kcups [sic]. . . . It's a longer negotiation than we first anticipated. They offer kcups [sic] in most of the rooms for I think $6 or $7 per kcup [sic]. . . . It's magnificent margins."

48. In a December 17, 2021 email, Cournoyer told investors that "Joecool has set up multiple revenue streams for sales of coffee and espresso shots through various national hotel and resort chains" and a wholesale grocery store.

49. Haber and Cournoyer's statements were false and misleading because the statements above were not true.

50. Defendants knew or were reckless in not knowing, and should have known, that their statements concerning Joecool's relationship with these businesses were false and misleading at the time they were made to investors and potential investors because none of the meetings or contracts they claimed ever occurred.

51. Haber's scienter is imputed to Joecool because he controlled the entity and was its controlling managing member.

10

52. The statements about Joecool's dealings with these business were material to investors because, in communications with investors from September 2019 through February 2022, Haber, individually and through Joecool, claimed Joecool's business model turned exclusively on Joecool's ability to sell its products to wholesalers, and reasonable investors would consider it important that a critical aspect of Joecool's business model was not occurring.

  **C. Haber and Joecool Made a False and Misleading Statement Regarding Haber's Wife's MLM Background.**

53. Starting in February 2022, Haber told investors that Joecool had pivoted to an MLM business model. Haber described Joecool's MLM business model as "Consumer-to-Consumer Sales" by "a team of over 250,000 Brand Loyal and Enthusiastic affiliate ambassadors" that Haber claimed Joecool was "building."

54. In a November 2023 document entitled "WHY INVEST IN JOECOOL?," Haber, through Joecool, solicited investors by making a false and misleading statement about his wife's MLM background by representing that she had "40 years [of] MLM experience."

55. This statement was also false and misleading because Haber's wife—who was 49 years old when Haber claimed she had 40 years of MLM experience—never founded, managed, or even worked for an MLM company.

56. Haber knew or was reckless in not knowing, and should have known, that his statement concerning his wife's MLM experience was false and misleading because he has been married to his wife since 1999 and was familiar with her age, work history, and background.

57. Haber's scienter is imputed to Joecool because he controlled the entity and was its controlling managing member.

58. The statement about Haber's wife's MLM background was material to investors because, from February 2022 to February 2024, Haber and Joecool claimed that Joecool's business was entirely dependent on successfully executing its MLM business

model and reasonable investors would consider it important that Joecool lacked any MLM experience.

V. **Haber Deceived Investors with False, Lulling Statements.**

59. Haber repeatedly lulled investors into thinking their investments were safe when they were not.

60. For example, in a February 24, 2022 email, the same investor discussed in paragraphs 36 and 37 asked Haber "[h]ow . . . it [was] going with the k-cups [sic]." By this point, Haber had misappropriated and misused most of this investor's investments totaling over $100,000. Nevertheless, Haber responded: "[w]e're working full-steam [sic] everyday [sic] . . . . I never stop until we hit the honey hole full of $$$. That's my job and favorite thing to do. . . . I'm 100% loyal to you."

61. Haber knew or was reckless in not knowing, and should have known, that he was deceiving this investor by claiming that he was working on the K-cups and was 100% loyal to the investor when, in fact, he had misappropriated and misused the investor's funds.

62. Another investor asked Haber in an August 20, 2022 email "[h]ow things [were] coming along for . . . . the trial run at [a hotel chain] and getting our foot in the door at [a grocery wholesaler]." Haber responded in an August 24, 2022 email that the trial run was "being worked on," and that he was "waiting for a response from the [grocery wholesaler's] legal department on when and how."

63. Haber knew or was reckless in not knowing, and should have known, that he was deceiving this investor by claiming that he was negotiating with a hotel chain and grocery wholesaler when, in fact, the hotel chain and grocery had never been in contact with Haber and never had any dealings with Joecool.

VI. **Joecool Offered and Sold Securities Without Filing a Registration Statement in Violation of Sections 5(a) and (c) of the Securities Act.**

64. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" as including "any note, stock" and "investment contract[.]" An investment

contract involves: (i) an investment of money, (ii) in a common enterprise, (iii) with an expectation of profits derived from the efforts of others.

65. Joecool's LLC units are securities in the form of an investment contract because: (i) investors made an investment of money in exchange for the units; (ii) Joecool investors' funds were pooled in Joecool bank accounts and their fortunes were collectively linked to Joecool's efforts and expertise with respect to the opportunities they presented, including with Joecool's wholesaler and MLM business models; and (iii) investors were entirely reliant on Joecool's efforts to generate returns.

66. Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)], make it unlawful for any person, directly or indirectly, to use interstate commerce or the mails, to sell a security unless a registration statement is in effect as to the security, or to offer to sell a security unless a registration statement has been filed as to such security.

67. Joecool offered and sold securities in the form of investment contracts to the general public by using the means or instruments of interstate commerce, including but not limited to telephones and the Internet.

68. Haber was a necessary participant and substantial factor in the sale of unregistered Joecool securities because he (i) was the sole author of the Joecool materials used to solicit investors; (ii) solicited Joecool investors via phone, email, and a YouTube video; (iii) was Joecool's controlling managing member; and (iv) was the only person responsible for running Joecool's business and issuing Joecool units.

69. Cournoyer was a necessary participant and substantial factor in the sale of unregistered Joecool securities because he solicited Joecool investors via phone, email, and a YouTube video, and, according to Haber, Joecool would not have raised any money without Cournoyer.

70. No registration statements were ever filed with the SEC or otherwise in effect with respect to Joecool's securities.

71. Joecool sold securities to at least one unaccredited investor and failed to take any steps to verify the accredited status of all but two investors.

**VII.   Cournoyer Acted as an Unregistered Broker in the Offer and Sale of Joecool Securities.**

72. As explained above, Cournoyer found and solicited Joecool investors via email, phone calls, and a video posted on YouTube, persuaded them to invest, and negotiated the terms of the investments.

73. Cournoyer repeatedly touted the merits of the Joecool investment to investors. For example, he told one investor that Joecool was "about to [b]reak out into huge revenues with multiple retail chains adding in our product to their lineup. It is a very exciting time and I wanted to make sure you had the opportunity to get in at the founders level . . . . Timing is everything and now the company is about to explode with revenues, so if you can take advantage of this opportunity, you really should . . . ."

74. As part of his pitch to potential investors, Cournoyer sent or caused to be sent various materials (*e.g.*, Joecool's investor prospectus, projections, newsletters, unit purchase agreements) to investors.

75. On occasion, Cournoyer negotiated the terms of the investments between Haber and prospective investors. For example, Cournoyer told one investor that he was able to secure an extra 0.5% interest for his investment "after speaking with . . . Joe [Haber]."

76. According to Haber, Joecool would not have been able to raise money without Cournoyer.

77. During the Relevant Period, Cournoyer was not registered as a broker, nor was he associated with a registered broker-dealer and, in fact, since 2004, Cournoyer has been barred from association with any broker pursuant to Section 15(b)(6) of the Exchange Act.

78. And as alleged above, Haber paid Cournoyer approximately half of the investor funds in exchange for finding investors, persuading them to invest, and negotiating the terms of their investment.

**VIII.   Defendants' Conduct was in the Offer or Sale, and in Connection with the Purchase or Sale, of Securities, and Done Using Interstate Commerce.**

79. The misstatements alleged herein were made and disseminated by Defendants

14

to induce investors to buy Joecool securities.

80. Further, these misstatements were made in written and oral communications soliciting investments and contained in emails and investor materials provided to investors in connection with their investments.

81. In addition, Haber and Joecool misappropriated and misused funds raised through the offer and sale of Joecool securities.

82. As such, Defendants' deceptive conduct, including their material misstatements, was in the offer or sale of securities as defined in Section 2(a)(1) of the Securities Act and in connection with the purchase or sale of securities as defined in Section 3(a)(10) of the Exchange Act.

83. In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, including soliciting investors by providing documents containing false and misleading statements via email, soliciting investors by phone, and obtaining funds from investors through interstate commerce.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and**
**Rules 10b-5(a) and (c) Thereunder**
**[15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a) and (c)]**
**(Against Haber and Joecool)**

84. The SEC re-alleges and incorporates by reference paragraphs 1 to 83 as though fully set forth herein.

85. Haber and Joecool, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities employed a device, scheme, and artifice to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

86. As a result, Haber and Joecool have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules l0b-5(a) and (c) thereunder [I7 C.F.R. § 240.10b-5(a) and (c)].

**SECOND CLAIM FOR RELIEF**
**Violations of Sections 17(a)(1) and (3) of the Securities Act**
**[15 U.S.C. § 77q(a)(1) and (3)]**
**(Against Haber and Joecool)**

87. The SEC re-alleges and incorporates by reference paragraphs 1 to 86 as though fully set forth herein.

88. Haber and Joecool, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have employed or are employing devices, schemes or artifices to defraud, and acting at least negligently, have engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of such securities.

89. As a result, Haber and Joecool have violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5(b) Thereunder**
**[15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b)]**
**(Against All Defendants)**

90. The SEC realleges and incorporates by reference paragraphs 1 to 89 as though fully set forth herein.

91. Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the

statements made, in the light of the circumstances under which they were made, not misleading.

92. As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5(b) thereunder [I7 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 17(a)(2) of the Securities Act**
**[15 U.S.C. § 77q(a)(2)]**
**(Against All Defendants)**

93. The SEC re-alleges and incorporates by reference paragraphs 1 to 92 as though fully set forth herein.

94. Defendants, directly or indirectly, acting at least negligently, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95. As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a), 77e(c)]**
**(Against All Defendants)**

96. The SEC realleges and incorporates by reference paragraphs 1 to 95 as though fully set forth herein.

97. Defendants, directly or indirectly, singly and in concert with others, have been offering to sell, selling, and delivering after sale, certain securities, and have been, directly and indirectly: (i) making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of written contracts, offering documents, and otherwise; (ii) carrying and causing to be carried through the mails and in interstate commerce by the means and instruments of transportation,

such securities for the purpose of sale and for delivery after sale; and (iii) making use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

98. The Joecool LLC units described in detail herein have been offered and sold to the public through a general solicitation of investors. No registration statements were ever filed with the SEC or otherwise in effect with respect to these securities.

99. Haber and Cournoyer were necessary participants and substantial factors in the sale of unregistered Joecool securities.

100. As a result, Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**SIXTH CLAIM FOR RELIEF**
**Violation of Section 15(a)(1) of the Exchange Act**
**[15 U.S.C. § 78o(a)(1)]**
**(Against Cournoyer)**

101. The SEC re-alleges and incorporates by reference paragraphs 1 to 100 as though fully set forth herein.

102. Cournoyer engaged in the business of effecting transactions in securities for the account of others, and directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the SEC or associated with a broker or dealer registered with the SEC.

103. As a result, Cournoyer has violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

**RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

**I.**

Find that the Defendants committed the violations alleged in this Complaint;

**II.**

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

**III.**

Order that Defendants disgorge any and all ill-gotten gains on a joint and several basis, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint;

**IV.**

Order that Defendants pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court, plus post-judgment interest;

**V.**

Order that Haber and Cournoyer be prohibited from acting as officers or directors of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**VI.**

Enter an injunction permanently restraining and enjoining Haber and Cournoyer from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however, that such injunction would not prevent them from purchasing or selling securities for their own personal account; and

**VII.**

Grant such other relief as this Court may deem just or appropriate.

**JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted this 13th day of January, 2025.

*s/ Zachary D. Williams*
Jodanna L. Haskins
Zachary D. Williams
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION